IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:

PETER W. KRIEGSMANN

:

    v.                     : Civil Action No. DKC 2005-2534

:

FWC RESIDENTIAL COMPANY[1]

:

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination case brought under the Americans with Disabilities Act ("ADA") is the motion of Defendant FWC Residential Company for summary judgment. (Paper 39). The issues are fully briefed and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the reasons that follow, the motion for summary judgment will be granted.

**I. Background**

The following facts are undisputed or construed in the light most favorable to Plaintiff Peter Kriegsmann, filing *pro se.* Beginning in 2000, Plaintiff was employed as a part time maintenance assistant at the apartment building located at 4800 Berwyn House Road in College Park, Maryland, where he also resided. In March 2004, Defendant acquired the property and hired several

---

[1] Plaintiff named Defendant as FirstWorthing in the caption of the complaint. Defendant submits that the actual name of the real party in interest is FWC Residential Company. The caption has been changed to reflect the name of the real party in interest, pursuant to Fed.R.Civ.P. 17(a).

employees of the prior owner, including Plaintiff and his supervisor, Paul Bridges.

The job description signed by Plaintiff in March 2004 provided that his primary duties and responsibilities would include those specifically assigned by his immediate supervisor, as well as replacing and repairing appliances, basic plumbing, and electrical fixtures; performing general maintenance repairs; and relaying information regarding general property appearance and condition to the property manager.  (Paper 39, Ex. 4).

On December 30, 2004, Bridges assigned Plaintiff the task of cleaning 132 resident mailboxes located in the main lobby of the building.  Plaintiff refused this task, stating that he could not complete it due to his medical condition, carpal tunnel syndrome. (Paper 39, Ex. 1, Kriegsmann Dep., at 294).  On January 2, 2005, Plaintiff sent Bridges a letter stating that he had repeatedly informed Bridges of his "multiple medical problems" including carpal tunnel surgery performed on both wrists, which made repetive motions such as strenuous rubbing very painful.  (Paper 39, Ex. 5). Also included in the letter were Plaintiff's complaints that he had been ordered on December 7, 2004, to clean the floors of the building when the elevators were not working, requiring him to carry a mop and bucket up seven flights of stairs;  he had inadequate work supplies; and Bridges had repeatedly failed to provide him with his work schedule far enough in advance for him to

2

schedule his doctors' appointments.   Plaintiff concluded the letter: "When viewed this pattern in its entirety, I can only interpret it as a form of harassment at work in direct violation of the Americans with Disabilities Act (ADA)." (*Id.*).

That same day Bridges forwarded Plaintiff's letter to his supervisor, building manager Michelle Valentine.   Valentine, Bridges, and Plaintiff met to discuss the issues raised in Plaintiff's letter.   On January 3, 2005, Valentine sent Plaintiff a letter requesting medical documentation of his physical limitations.   Specifically, Valentine sent Plaintiff a copy of his job description with a request that he send the job description to his physician and have him or her note or highlight any job function that Plaintiff would be unable to perform. (Paper 39, Ex. 6).   Valentine's letter also noted that in a meeting on December 2, 2004, when Plaintiff was asked to communicate any restrictions he had in relation to his position, his only limitation was that he could not work after 2:00 p.m. due to required physical therapy, a limitation Defendant had honored by not scheduling him for work beyond 2 p.m.   (*Id.*).

On January 13, 2005, Valentine met with Plaintiff to conduct his annual performance review.   She wrote in a letter to his employee file that he became upset during his performance review about some of the comments in his review, raised his voice and cursed. (Paper 39, Ex. 21).   Valentine wrote that she notified

Plaintiff that this was the second occasion on which she has corrected him regarding his unprofessional behavior at work. (*Id.*).

On February 4, 2005, Plaintiff provided Defendant with a letter from his physician, Dr. Roji Menon.  Dr. Menon's letter stated that Plaintiff had been a patient of the clinic for many years and listed a number of ailments from which Plaintiff suffered.  Dr. Menon did not offer an opinion on Plaintiff's work restrictions other than noting that he had carpal tunnel surgery on both wrists and that "repetitive motions can trigger his symptoms." (Paper 39, Ex. 9).  On February 7, Lyn Kruger, vice president of human resources, sent Plaintiff a letter advising him that the information provided by Dr. Menon was incomplete.

> [T]his information does not provide us with
> specific limitations and clear restrictions
> with regards to your current job
> responsibilities. . . . You have indicated in
> prior communications that we are potentially
> violating your ADA rights by asking you to
> perform certain job functions, specifically
> polishing the tenant mail boxes (a row of
> boxes approx. 7 feet long and 2 feet high
> each) which you stated you cannot do because
> of an unspecified disability. . . . [W]e must
> obtain more specific information regarding
> limitations and/or restrictions due to any
> medical impairments you have. . . . [W]ith
> regard to your refusal to polish the mail
> boxes because of your medical condition, we
> need your medical practitioner to specifically
> state what medical condition prevents you
> [from] performing this task and exactly how
> you are limited.  For instance, we would like
> to know whether you can perform this task over
> a period of days with specific limits, *e.g.,*

> polishing a certain number of minutes with
> certain breaks in between.  Overall, we need
> to have more specific information regarding
> what limitations you have with respect to all
> of your job responsibilities.

(Paper 39, Ex. 10).  On February 10, Plaintiff responded by letter:

> When I saw my primary physician on February 4,
> 2005, she asked me if I knew of any
> jobs/tasks/chores I could not perform as
> outlined in the job description.  I responded
> I knew of none.  Polishing 120 [sic] mailboxes
> with no other tools than sandpaper and/or
> steel wool was not indicated in the job
> description. . . .

(Paper 39, Ex. 12).

On February 11, Plaintiff wrote a second response letter which he hand delivered to Valentine.  In this letter Plaintiff accused Valentine of harassing him "with lengthy, unwarranted, and obnoxious instructions," "intimidating telephone calls," and "a flood of unsolicited mail." (Paper 39, Ex. 13).  Valentine wrote an email to Kruger that same day stating that when Plaintiff dropped off the second letter he raised his voice at her and said Defendant was "complicating his damn life." (Paper 39, Ex. 11).  Valentine noted that this was the "third incident" and requested Kruger's assistance "in either a written action or termination letter." (*Id.*).  Valentine documented the disciplinary action in a written Performance Correction Notice presented to Plaintiff on February 19.  (Paper 39, Ex. 24).  The notice identified three prior warnings for behavioral infractions, in September 2004, January 13, 2005, and February 11, 2005.  (*Id.*).  The notice stated

that on February 11, Plaintiff was rude, argumentative, and hostile in earshot of other co-workers and residents, his language was unprofessional, and his continued outbursts were disruptive and insubordinate.  (*Id.*).  Plaintiff was warned that he was being placed on formal notice and that if he ever again displayed unprofessional conduct he would be immediately discharged for cause.  (*Id.*).  Plaintiff refused to sign the document.

On February 15, Plaintiff sent Valentine a letter from Dr. Menon stating that "no restrictions or limitations are indicated on Mr. Kriegsmann's ability to perform the normal functions as outlined in his job description." (Paper 39, Ex. 14).  Dr. Menon signed and attached the most recent job description for Plaintiff to her letter.  This job description provided that Plaintiff's primary job duties included, among other things, cleaning all amenity areas; cleaning and removing debris from community grounds, breezeways and amenity areas; completing minor work orders as directed by the maintenance supervisor; and performing sweeping, mopping, vacuuming, trash removal and other cleaning in interior common areas and units.  (*Id.*).  The job description also stated that the position required the employee to spend over two-thirds of his time using and/or reaching with his hands.  (*Id.*).

On February 18, Kruger wrote Plaintiff a letter stating that the information he had provided from his physician had not addressed his claim that his disability prevented him from cleaning

the mailboxes.  (Paper 39, Ex. 15).  Plaintiff responded by email on February 24 stating that if he was given an electric drill with attachments of sandpaper and steel wool, he would consider that a reasonable accommodation and would clean the mailboxes.  (Paper 39, Ex. 16).  On March 10, Jinger Doss, market director, sent a letter to Plaintiff stating that he had been sent several notices requesting medical documentation regarding his specific limitations and without such documentation Defendant was uncomfortable providing accommodations for Plaintiff.  (Paper 39, Ex. 18).  Doss also wrote that to avoid violating Plaintiff's potential ADA rights, Plaintiff was being placed on an unpaid leave of absence until he provided the requested documentation.  (*Id.*).  Doss indicated that once Defendant received clarification about Plaintiff's specific physical limitations it would assess the situation and make a decision about Plaintiff's ability to return to work in his current position.  (*Id.*).

On April 1, Plaintiff sent Kruger a letter from his hand surgeon, Craig M. Person, M.D., which indicated that Plaintiff had been under his care for ten years for degenerative arthritic conditions of his wrists.  Dr. Person offered his opinion about Plaintiff's specific limitations:

> [H]e will not have problems lifting or carrying objects.  He will also not have problems using objects such as rakes, brooms, ladders, and mops.  It is my opinion, however, that Mr. Kriegsmann should not perform any activities which require him to apply pressure

> to objects with his hands.  This would not
> include simple activities such as wiping down
> surfaces but would certainly include
> activities requiring sustained pressure such
> as trying to remove tarnish and dirt from
> objects using steel wool pads and other such
> activities.

(Paper 39, Ex. 20).  Dr. Person's letter gave Defendant "a better idea of what [Plaintiff] could and should do" and his suspension was lifted on April 10.  (Paper 39, Ex. 19 ¶ 7).

Valentine summarized the events of April 19, 2005, in a contemporaneous email to Kruger.  (Paper 39, Ex. 26).  On April 19, Plaintiff was ordered to clean three vacant apartments to get them ready for new tenants.  Plaintiff refused the assignment, stating that it was not in his job description and that his doctor told him he could not perform this task.[2]  (Paper 39, Exs. 25 & 26).  Valentine wrote that she asked Plaintiff to do only those tasks that Dr. Person specifically permitted, such as sweeping, mopping, and wiping down surfaces in the vacant units.[3]  (Paper 39, Ex. 26).  Valentine explained that his refusal to clean the apartments was insubordination.  (*Id*.).  Plaintiff steadfastly refused to clean

_____

[2] Plaintiff had cleaned one to two vacant apartments per week under the previous management.  (Paper 39, Ex. 1, Kriegsmann Dep., at 108-09, 113).

[3] Plaintiff asserts in his unsworn opposition that Valentine lied in her email to Kruger and that she never limited her assignment to the tasks approved by Dr. Person.  (Paper 45, at 17).  Plaintiff has not supported this assertion with any evidence, such as deposition testimony or an affidavit.

the apartments and Valentine immediately terminated his employment. (*Id.*).

Plaintiff filed suit against Defendant on September 13, 2005, alleging that Defendant's termination of his employment for refusal to complete "certain tasks" violated his rights under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq*. (Paper 1 ¶ 6). After discovery, Defendant filed the instant motion for summary judgment on December 18, 2006. (Paper 39).

## II. Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979). The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Catawba*

*Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324. However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III.  Analysis

There are two methods for proving intentional discrimination in employment: (1) through direct or indirect evidence of intentional discrimination, or (2) through circumstantial evidence under the three-step, burden-shifting scheme set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973); *see also Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 57 (4th Cir. 1995) (applying *McDonnell Douglas* framework to claims brought under the ADA).  For the first method, an employee may utilize "ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue."  *Rhoads v. Fed. Deposit Ins. Co.*, 257 F.3d 373, 391 (4th Cir. 2001) (internal quotation omitted), *cert. denied*, 535 U.S. 933 (2002).  In order to overcome a summary judgment motion based upon this method of proof, the plaintiff "must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact."  *Id.* (internal quotation omitted).  More specifically, the plaintiff must provide "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision."  *Id.* at 391-92 (internal quotation omitted).  If such evidence is lacking, the plaintiff nevertheless may proceed under

11

*McDonnell Douglas*.   *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

Under the *McDonnell Douglas* framework, the plaintiff first must establish a *prima facie* case of discrimination.  *See McDonnell Douglas Corp.*, 411 U.S. at 802.   Once a plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to present a legitimate, nondiscriminatory reason for the adverse employment action alleged.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citing *Tx. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).   If the defendant succeeds in doing so, that will rebut the presumption of discrimination raised by the plaintiff's *prima facie* case.   *See Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420, 429 (4th Cir. 2000) (citing *Burdine*, 450 U.S. at 255 n.10).   The plaintiff then must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253.   In the end, "[t]he plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her."  *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Burdine*, 450 U.S. at 253).   Because Plaintiff has presented no direct evidence of discrimination he must proceed under the *McDonnell Douglas* burden-shifting framework.

To establish a *prima facie* wrongful discharge claim under the ADA, a plaintiff must show that (1) he was a "qualified individual with a disability"; (2) he was discharged; (3) he was fulfilling his employer's legitimate expectations at the time of discharge; and (4) the circumstances of his discharge raise a reasonable inference of unlawful discrimination. *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 273 (4th Cir. 2004). Defendant claims that it is entitled to summary judgment because Plaintiff is unable to satisfy the first, third, and fourth elements of the *prima facie* case.

## A. Qualified Individual with a Disability

Defendant argues that Plaintiff cannot establish the first element because his carpal tunnel syndrome is not a qualifying disability. Plaintiff responds in his opposition that he has a host of medical conditions, including hearing loss and psychiatric disorders, which qualify him as an individual with a disability under the ADA. (Paper 45, at 8-10). Defendant objects to Plaintiff's assertion that his ADA claim in this case is based on any alleged disability other than his carpal tunnel syndrome. Defendant argues that by raising these other alleged disabilities for the first time in his opposition Plaintiff has violated the Fed.R.Civ.P. 8(a) requirement that a pleading must "give the defendant fair notice of what the plaintiff's claim is and the

grounds upon which it rests." *Swierkiewicz v. Sorema N. A.*, 534
U.S. 506, 512 (2002).

Although Plaintiff listed a number of medical conditions in
his complaint (paper 1, at 4), the substance of the lawsuit is the
allegation that Defendant engaged in disability-based
discrimination by requiring him to perform certain manual tasks.
(Paper 1 ¶ 6) ("A hand surgeon clearly stated that I should not
perform certain tasks. . . . Management ordered me to do those
tasks anyway.").  Plaintiff has alleged that Defendant's orders
that he mop the floors when the elevators were out of order, clean
mailboxes, and clean vacant apartments violated his rights under
the ADA.  (Paper 39, Ex. 2, Response No. 9; paper 47, Ex. A, EEOC
Charge).  Plaintiff has consistently alleged that his carpal tunnel
syndrome limited his ability to perform these tasks; he has not
alleged, however, that any of his other medical conditions impaired
his ability to perform these tasks.  The factual allegations pled
by Plaintiff are limited to the ways in which his carpal tunnel
syndrome, and no other medical condition, limited his ability to
perform these specific tasks.  Therefore, the inquiry will focus on
whether Plaintiff's carpal tunnel syndrome qualifies him as an
individual with a disability under the ADA.

Noting that symptoms vary widely from person to person, the
Supreme Court held that "an individual's carpal tunnel syndrome
diagnosis, on its own, does not indicate whether the individual has

14

a disability within the meaning of the ADA." *Toyota Motor Mfg.,
Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002).  A "disability"
within the meaning of the ADA is a physical or mental impairment
that substantially limits one or more major life activities.  42
U.S.C. § 12102(2)(A).  The ADA requires the existence of a
disability to be determined on a case-by-case manner.  42 U.S.C. §
12101(2).  The Supreme Court emphasized that "[m]erely having an
impairment does not make one disabled for purposes of the ADA.
Claimants also need to demonstrate that the impairment limits a
major life activity." *Toyota*, 534 U.S. at 195.  "Major life
activities" refers to those activities that are of central
importance to daily life.  *Id.* at 197.  Although there is no
exhaustive list of activities, the Supreme Court has cited to the
Rehabilitation Act regulations, which defines major life activities
to include "functions such as caring for one's self, performing
manual tasks, walking, seeing, hearing, speaking, breathing,
learning, and working."  45 C.F.R. § 84.3(j)(2)(ii); *Toyota*, 534
U.S. at 195.  These terms must be interpreted strictly to create a
demanding standard for qualifying as disabled.  *Id.*

In *Sutton v. United Air Lines, Inc.*, the Supreme Court noted
that assuming that working is a major life activity, a claimant
would be required to show an inability to work in a "broad range of
jobs," rather than a specific job.  *Sutton*, 527 U.S. 471, 492
(1999); 29 CFR § 1630.2(j)(3) (2001) ("With respect to the major

15

life activity of working[,] [t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities"). "When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." *Toyota*, 534 U.S. at 200-01. Plaintiff cites *Terrell v. USAir, Inc.*, 132 F.3d 621 (11th Cir. 1998), as a case where a court has found a plaintiff with carpal tunnel syndrome to be disabled within the meaning of the ADA. (Paper 45, at 20). Plaintiff misinterprets the court's language in *Terrell*. The district court found that the plaintiff was not disabled because she had not shown that her carpal tunnel syndrome substantially limited a major life activity. The United States Court of Appeals for the Eleventh Circuit declined to address the issue of whether the plaintiff was disabled because it held that the district court correctly ruled that the employer had provided reasonable accommodations. *Terrell*, 132 F.3d at 624-25 n.4. Therefore, *Terrell* does not stand for the proposition suggested by Plaintiff.

Defendant argues that whatever activities Plaintiff may be limited in doing as a result of his carpal tunnel syndrome, they do

not qualify as "major life activities."  Defendant points to Plaintiff's testimony:

> [T]here are not too many other functions that I normally do that I can't do today.  I'm talking about normal situations whether it's shaving or washing the dishes or wiping something down.  I can do it to this day.  I just can't do anything very rigorous and of long duration and certainly cleaning 132 mailboxes would come under the latter category.

(Paper 39, Ex. 1, Kriegsmann Dep., at 356-57).  Plaintiff further testified that he is capable of brushing his teeth, shaving, combing his hair, showering, bathing, dressing, putting on shoes, tying shoelaces, shopping for food, shopping for clothes, and performing all his routine personal tasks without any help.  (*Id.* at 357-58).  Dr. Person, Plaintiff's hand surgeon, wrote that Plaintiff would not have problems lifting or carrying objects; using tools such as rakes, brooms, ladders, and mops; or performing simple activities such as wiping down surfaces.  (Paper 39, Ex. 20).

Dr. Person wrote, however, that Plaintiff could not perform any activities which require him to apply sustained pressure to objects with his hands.  (*Id.*).  The only personal activity Plaintiff identified as being unable to perform because of his carpal tunnel syndrome is playing tennis.  (Paper 39, Ex. 1, Kriegsmann Dep., at 356).

Plaintiff has not established that his carpal tunnel syndrome substantially limits the major life activity of working because it does not prohibit him from working in a broad range of jobs. *See Sutton*, 577 U.S. at 492.  In addition, Plaintiff's carpal tunnel syndrome does not substantially limit the major life activity of performing manual tasks.  The manual tasks Plaintiff is limited in doing as a result of his carpal tunnel syndrom, playing tennis and applying sustained pressure to objects with his hands, are simply not of central importance to most people's daily lives.  *See Toyota*, 534 U.S. at 200-01.  While Plaintiff is impaired by his carpal tunnel syndrome to some degree, that impairment does not substantially limit a "major life activity" as defined by the ADA. Accordingly, Plaintiff is not a "qualified individual with a disability" and cannot establish the first element of the *prima facie* case.  Summary judgment in favor of Defendant is warranted on this basis alone.

## B.  Fulfilling Employer's Legitimate Expectations

Even if Plaintiff's carpal tunnel syndrome qualified as a disability under the ADA, which it plainly does not, Defendant would be entitled to summary judgment because Plaintiff cannot establish that he was fulfilling his employer's legitimate expectations at the time of his discharge, the third element of the *prima facie* case.  Between September 2004 and February 2005, Plaintiff was given three verbal warnings about his unprofessional

18

behavior when speaking to Valentine, specifically cursing and raising his voice. (Paper 39, Exs. 21, 23 & 24). In a written warning delivered on February 19, 2005, Valentine noted that Plaintiff's "conduct has steadily deteriorated over the past several months. When [he has] been asked to do special projects or when asked to provide detailed and pertinent information regarding [his] job duty restrictions [he] respond[s] in a curt and condescending manner." (Paper 39, Ex. 24). Plaintiff's employment was terminated for insubordination on April 19, 2005, when he refused to clean three vacant apartments, even after Defendant limited his tasks to those specifically authorized by his doctor such as sweeping, mopping, and wiping surfaces. (Paper 39, Ex. 26).

Plaintiff argues in his opposition that he speaks in a louder than normal voice as a result of his hearing impairment, and Valentine misinterpreted this as shouting. (Paper 45, at 10). In his deposition, however, Plaintiff admitted that during one of the times Valentine cited him for raising his voice at her he was, indeed, irate and yelling. (Paper 39, Ex. 1, Kriegsmann Dep., at 273). Plaintiff also argues that the only curse word Defendant has alleged that he used was the word "damn," which is not actually a curse word. The fact that Plaintiff does not consider his raised voice and use of the word "damn" on multiple occasions to be inappropriate and insubordinate conduct is irrelevant. "What

matters is not the employee's self-perception regarding the quality of his job performance, but the perception of the decision-maker." *Mungro v. Giant Food, Inc.*, 187 F.Supp.2d 518, 522 (D.Md. 2002) (internal quotations omitted).

Defendant's employee handbook listed as unacceptable behavior "using obscene, abusive, or threatening language" and insubordination.  (Paper 39, Ex. 27, at 0043-44).   The handbook also indicated that an employee may be terminated after he has been "given the opportunity to meet performance and/or behavior standards and in management's evaluation has failed to do so." (*Id*. at 0043).    Plaintiff acknowledged that he received the handbook.  (*Id*. at 0115).   Plaintiff was warned that his behavior was unacceptable, yet he did not correct it.   Defendant perceived Plaintiff's refusal to clean the vacant apartments on April 19 as another instance of insubordination and warned him accordingly. Plaintiff nevertheless continued to refuse to clean the apartments. Plaintiff's ADA claim does not insulate his insubordination because, assuming *arguendo* that his carpal tunnel syndrome qualified as a disability, Defendant only required that he perform the tasks specifically authorized by his doctor.   When Plaintiff refused even these tasks, Defendant terminated his employment.  The court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged

with employment discrimination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998).

Defendant has offered undisputed evidence that Plaintiff was not meeting its legitimate expectations at the time of his discharge.  Thus, Plaintiff has failed to establish the third element of the *prima facie* case for discriminatory discharge under the ADA and Defendant is entitled to summary judgment on that basis as well.

**IV.  Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment will be granted.  A separate Order will follow.

_____/s/_____

DEBORAH K. CHASANOW
United States District Judge
